NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0240n.06

Case Nos. 09-2621 / 16-1717

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| EDDIE WAGLE, | ) | FILED |
|  | ) | Apr 26, 2017 |
| Petitioner-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
|  | ) | THE WESTERN DISTRICT OF |
| JERI-ANN SHERRY, | ) | MICHIGAN |
|  | ) |  |
| Respondent-Appellee. | ) |  |
|  | ) |  |

BEFORE: COLE, Chief Judge; SUTTON and KETHLEDGE, Circuit Judges.

SUTTON, Circuit Judge. Convicted of the murder of David Hudson and unable to obtain relief on direct review in the state courts, Eddie Wagle filed a habeas petition in federal court, raising a *Brady* claim (that the State failed to disclose certain evidence before trial) and a Fifth Amendment claim (that the State introduced evidence that Wagle refused to speak to police and sought an attorney). The district court denied his petition. Because neither of the alleged errors prejudiced Wagle's trial, we affirm.

I.

On the evening of June 23, 1998, five friends (Wagle, Chris Davis, Jerry Davis, Danny Troncone, and Hudson) spent the evening drinking together to celebrate a friend's birthday. As the group left the Campus Q pool house, a playful wrestling match broke out in the parking lot between Hudson and Jerry Davis. In the melee, someone accidentally struck Chris Davis in the

mouth. Chris Davis denies becoming angry, but Wagle and Troncone say things got "tense." R. 119-2 at 276. Hudson in any event decided to go home after the wrestling match. When no one offered to drive him, he left on foot.

The remaining four decided to continue the night at a friend's house nearby. Wagle left in his car with Chris Davis, and Jerry Davis followed behind with Troncone. When they arrived at the house, it was dark, prompting them to set out for a new destination.

The group made two more stops. Wagle pulled over on a street adjacent to his girlfriend's house. He exited the car and briefly walked out of sight. Chris Davis alleges that Wagle left to retrieve his .40 caliber pistol. After returning to the car, Wagle drove back to the Campus Q parking lot, passing Hudson along the way. At Campus Q, Wagle again got out of the car, this time to switch places with Chris Davis. Wagle says that he asked Davis to drive because the two had agreed to go back to Davis's home (a much greater distance), and Wagle was still on probation. But Davis didn't head home. He drove back to where David Hudson was walking along the road. What happened next was the issue at trial.

According to Wagle, Chris Davis pulled up next to Hudson, leaned over from the driver's seat, and fired twice through the passenger-side window. But Chris Davis and his brother Jerry Davis both say that Wagle fired the two shots from the passenger's seat. Troncone, a passenger in Jerry Davis's car, first told police that Wagle shot Hudson but later recanted and said he could not see who fired the shots. Hudson died within minutes.

After the shooting, Chris Davis led the group back to the friend's house where they had first planned to go. Once there, Wagle and Davis ran to the back of the house. According to Davis, Wagle attempted to throw the gun into a tree but fell and lost the handgun in the backyard. Unable to find it in the dark, the four men left to regroup at Davis's house. According

2

to Jerry Davis, Wagle threatened the others not to tell anyone about what had happened. When asked if Hudson was dead, Wagle responded: "I shot him in the head. He has to be." R. 119-3 at 349.

On June 25th, after police picked up Jerry Davis for questioning, Wagle, Chris Davis, and Troncone met at Orchard's Lounge and decided to speak to the police. Troncone testified that after the meeting, he asked Wagle why he had done it. Wagle replied that he had not been using his head and that the alcohol hadn't helped.

Wagle went to the police station the next day to ask about the investigation. Police told Wagle he was a suspect and gave him a *Miranda* warning. Wagle decided not to give a statement, telling police he wanted to speak to an attorney, after which he left the station.

A few days later, the group met again at a hotel with several others. Lena Boyd, Jerry Davis's girlfriend, testified that Wagle spent the evening "reminding" his girlfriend that she had his gun with her on the night of the murder. Boyd also claimed that Wagle later bragged about how "[t]hey didn't have nothing on him and . . . look what he got away with." *Id.* at 569.

The physical evidence also pointed to Wagle. Police recovered two bullet casings from the road near Hudson's body. Ballistics testing of the murder weapon indicated that the casings would have rebounded backwards when ejected from the barrel. That means the shooter likely fired at Hudson from outside (rather than inside) the car, suggesting in turn that the shooter was likely in the passenger's seat. Police recovered the murder weapon from a pond on a vacant lot owned by Wagle's uncle. Someone had broken the gun into multiple pieces before discarding it in the water.

Prosecutors charged Wagle with first-degree murder, Mich. Comp. Laws § 750.316(c), possession of a firearm during the commission of a felony, *id.* § 750.227b, and possession of a

firearm by a felon, *id.* § 750.224f. After a three-day trial, the jury found Wagle guilty on all counts. Wagle unsuccessfully appealed. He then filed a petition for habeas corpus relief in federal court. *See* 28 U.S.C. § 2254. The district court denied the petition. While Wagle's appeal was pending, his attorney discovered evidence not previously disclosed to his defense team. In view of that discovery, we remanded the case to the district court, which stayed the action while Wagle exhausted his claims based on the newly discovered evidence.

The state court denied Wagle's efforts to reopen the judgment. It rejected Wagle's *Brady* claim because the undisclosed evidence was "not sufficiently exculpatory to overcome the substantial evidence presented against him at trial." R. 97-13 at 14. It also rejected his Fifth Amendment claim. Even if the use of Wagle's silence violated the Fifth Amendment, the court held that the violation did not amount to "actual prejudice," Mich. Comp. Law § 6.508(D), because Wagle had not shown "a reasonably likely chance of acquittal" or an error "so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." R. 97-13 at 7. The Michigan Court of Appeals and Michigan Supreme Court denied leave to appeal. The district court likewise rejected these claims, after which Wagle appealed.

## II.

To obtain relief under *Brady v. Maryland*, 373 U.S. 83 (1963), Wagle must show that the relevant evidence was (1) suppressed, (2) exculpatory or impeaching, and (3) material. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). To be exculpatory, the evidence must be favorable to the defendant in a way that is apparent to law enforcement. *Moldowan v. City of Warren*, 578 F.3d 351, 383, 388 (6th Cir. 2009). To be impeaching, the evidence must show the bias or prior inconsistency of one of the State's witnesses. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). And to be material, the evidence must create a "reasonable probability" of a

different outcome. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Although we consider materiality in light of the evidence as a whole, we evaluate "the tendency and force of the undisclosed evidence item by item." *Id.* at 436 n.10.

Because the state court addressed Wagle's *Brady* claim on the merits, deference under the Antiterrorism and Effective Death Penalty Act is due. 28 U.S.C. § 2254(d). Resolution of the case thus turns on whether the state court unreasonably applied the Court's holding in *Brady* in finding the undisclosed evidence immaterial to the outcome of Wagle's trial. *See Williams v. Taylor*, 529 U.S. 362, 409 (2000).

Wagle claims that seven pieces of undisclosed evidence establish a *Brady* violation.

(1) The Patrick Wilson Interview. Patrick Wilson shared a jail cell with Chris Davis before Wagle's trial. According to Wilson, Davis told him that Wagle had broken the murder weapon into several pieces and thrown it into the water on "'some of his people's property' . . . out in the country." R. 97-8, Ex. M at 647. He also said that Davis told him that Wagle "was just supposed to 'scare' Dave Hudson, not kill him," and that the murder took place because Hudson owed Davis drug money. *Id.* at 648.

(2) A *Miranda* warning card showing that the police Mirandized Wagle on the day he first came to the station.

(3) The Ted Saffell Interview. Saffell heard two shots fired on the night of the murder. In his interview, he indicated that the first shot sounded more muffled than the second, but he could not see who fired either one.

(4) The Tracey Harlan Interview. When asked if Hudson had any enemies, Harlan (Hudson's girlfriend) said that "three or four days ago [Hudson] and Chris Davis had an

argument over some 'bad marijuana' that [Hudson] got." R. 97-8, Ex. U at 128. But she added "that this was all 'ironed out,'" and she "didn't think there was any problem there." *Id.*

(5) The Dave Ellis Interview. Ellis spent the first half of the night in question drinking with Hudson. He decided to go home around 10:30 PM because he had to work the following morning. In his interview, he indicated that Hudson owed Chris Davis a "dope debt" of about 700 or 800 dollars. R. 97-8, Ex. W at 683.

(6) The Frank Pipkins Interview. Pipkins, a friend of the group, was drinking with Hudson, Chris Davis, and Jerry Davis before the shooting. Pipkins went home early to call his girlfriend and did not know what happened after he left. In his interview with police, he indicated that "there were a lot of people who didn't like Hudson." R. 97-8, Ex. T at 667. He also stated that all five men were "very close" but that Chris Davis "wasn't as close as the rest." *Id.* at 668. He added that Hudson's step-father believed that the Davises "and possibly the others" had played a role in Hudson's death. *Id.*

(7) The Chris Davis Interview. Davis came to the police station on July 6, 1998, to ask why investigators wanted to speak with him. He told the officers on duty that he was not ready to give a statement but would be in touch. R. 97-8, Ex. Z at 691. According to the report, Davis "needed more time to think about it" before speaking to police. *Id.*

This evidence does not show that the state courts unreasonably rejected Wagle's *Brady* claim. Wilson's testimony that Wagle killed Hudson, dismantled the murder weapon, and threw it into the water to evade capture does not exculpate him from much of anything. And if Wilson's interview impeaches anyone, it's Wagle. The Miranda card also says nothing beneficial about Wagle's guilt or innocence. It shows only that police gave Wagle a *Miranda* warning. No help there. Nor does the Ted Saffell interview corroborate Wagle's account of the

6

evening.  Saffell told police that the first shot sounded more muffled than the second.  But Wagle testified at trial that Chris Davis fired the first shot while his arm was out of the car window.  Wagle also claimed that, before Davis fired the second shot, Wagle grabbed his arm by the elbow in "an upward position."  R. 119-4 at 664.  He did not claim, as he does now, that the shots came from inside the car.  Nothing about Wagle's account suggests that the first shot would be more muffled than the second.  If anything, it suggests the opposite.  Roughly half of the undisclosed evidence, then, does not prejudice Wagle and, if anything, incriminates him.

That leaves the other half:  the Pipkins, Harlan, Ellis, and Chris Davis interviews.  The jury, as it turns out, heard the pertinent portions of the Harlan and Ellis statements.  Harlan testified at trial that Hudson owed Chris Davis money for marijuana and that they "argued all the time."  R. 119-2 at 168.  Her statement to police that the two had argued over drugs a few days earlier would have added little more.  The same is true of Ellis's statement that Hudson owed Chris Davis a "dope debt."  The jury heard that fact from Harlan.

The rest won't quicken any pulses either.  Pipkins' assessment of the group's friendship dynamics and the reality that Chris Davis did not want to speak to police before thinking things over are both vague and more ambiguous than probative.  Had Davis, for example, recently witnessed his friend murder someone (and potentially egged him on to do it), any hesitation about speaking to the police would be as consistent with the prosecution's theory of the case as it would be with Wagle's.

In assessing the reasonableness of the state court's *Brady* decision, moreover, it's worth remembering all of the evidence implicating Wagle.  Two eyewitnesses identified him as the shooter.  Two other witnesses testified that he made comments implicating himself afterwards.  The placement of the bullet casings suggested that the passenger (Wagle), not the driver (Davis),

7

had fired the weapon. Wagle could not produce his personal handgun, which he claimed to have sold the morning of the murder. And police found the murder weapon on property owned by his family.

Wagle complains that the state court analyzed the evidence individually rather than cumulatively. Not true. It stated that "the 'cumulative effect' of the newly discovered evidence did not actually prejudice [Wagle] when considering the substantial amount of evidence supporting his guilty conviction." R. 97-13 at 14. That the court incorporated its prior individualized analysis of each piece of evidence does not alter the reality that it engaged in a thorough, and cumulative, review before rejecting Wagle's claim.

III.

The gist of Wagle's *Miranda* claim is that the State violated his Fifth (and Fourteenth) Amendment rights when it introduced into evidence that he came to the police station on June 26, 1998, and told the police he did not want to give a statement until he spoke to an attorney. There is some debate about whether he exhausted this claim in the state courts. And there is some debate about whether introducing this noncustodial, post-*Miranda* statement amounts to a Fifth Amendment violation at all. *See Doyle v. Ohio*, 426 U.S. 610 (1976). But we need not resolve either issue. Even if we assume that Wagle exhausted the argument and even if we assume the introduction of the statement amounted to a Fifth Amendment violation, no prejudice arose from it, just as the state court concluded for purposes of Michigan law.

When reviewing errors of this ilk on collateral review, we ask whether the error resulted in "actual prejudice" or, more precisely, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993); *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007). No such error occurred.

8

*Brecht* itself proves as much. As in *Brecht*, which likewise concerned the unlawful use of post-*Miranda* silence, 507 U.S. at 639, the State made only two brief references to Wagle's silence, once while cross examining Wagle and once while questioning Officer Robert O'Brien. In an 818-page record, these discussions covered less than three pages. The examination of Officer O'Brien lasted less than a half page, and the cross examination of Wagle less than two pages. As in *Brecht*, *id.* at 639, the State had considerable evidence of Wagle's guilt separate from his decision not to give a statement to police. Any inference the jury might have taken from his silence shrinks when compared to the other evidence arrayed against him at trial. On this record, we cannot say that the isolated use of Wagle's post-*Miranda* silence demonstrates the "actual prejudice" necessary to justify habeas relief.

For these reasons, we affirm.